UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTWANN GARRETTT, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01509-SEB-TAB |
| | ) | |
| AQUATIC RENOVATION SYSTEMS, INC. | ) | |
| d/b/a RENOSYS | ) | |
| d/b/a RENOSYS CORP. | ) | |
| d/b/a SAUNA SOURCE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Aquatic Renovation Systems, Inc.'s d/b/a/ RenoSys, d/b/a RenoSys Corp., and d/b/a Sauna Source "("RenoSys") Motion for Partial Summary Judgment [Dkt. 41], filed on July 19, 2019, pursuant to Federal Rule of Civil Procedure 56. Plaintiffs Antwann Garrett and Lawrence Maxey, on behalf of themselves and others similarly situated, initiated this employment litigation against RenoSys, specifically alleging that RenoSys violated provisions of the Indiana Wage Payment Statute, IND. CODE § 22-2-5-2, ("Payment Statute") by failing to timely pay Plaintiffs for all hours worked, making improper deductions from Plaintiffs' paychecks, and failing to pay Plaintiffs for prevailing

1

wage jobs in a timely manner.[1] [Dkt 1 at ¶ 41]. Defendant contends that because both Mr. Garrett and Mr. Maxey were involuntarily terminated, they do not have standing to bring a claim under the Payment Statute. [Dkt 41 at 3].

Because we find the record "replete with credibility questions and competing versions of the facts, demonstrat[ing] that this case should be sorted out by the trier of fact," *Paz v. Wauconda Healthcare & Rehab. Ctr.*, LLC, 464 F.3d 659, 665 (7th Cir. 2006), Defendant's Motion for Partial Summary Judgment is DENIED

## Factual Background

As discussed herein, many of the material facts are disputed by the parties.

### A. Plaintiffs' Alleged Lost Income and RenoSys's Compensation Policies

RenoSys is an Indiana corporation that sells and installs swimming pools and swimming pool-related products. [Dkt. 42 at 2]. Leading up to May 2018, Mr. Garrett and Mr. Maxey were employed by RenoSys as an installer/welder/crew leader and installation crew member, respectively. [Dkt. 43-2, State Aff. ¶¶ 2-3]. They were paid on an hourly basis and were not exempt from overtime. [Dkt. 20 at 11].

---

[1] Count One of the Amended Complaint involves Plaintiffs' individual Payment Statute claims, while Count Two involves Plaintiffs' collective action Payment Statute claims. Because Plaintiffs putative collective action Payment Statute claims are contingent on Plaintiffs' individuals claims, Count Two rises or falls on the survival of Count One. *See Neely v. Facility Concept, Inc.*, 274 F. Supp 3d 851, 855-56 (S.D. Ind. Apr. 4, 2017). Although not disputed at this juncture, Plaintiffs also assert claims under the Federal Fair Labor Standards Act.

Starting sometime in 2018, RenoSys employees began using a web-based application to record their hours electronically. [Dkt. 20 at 14]. The web-based application enabled RenoSys to adjust the hours entered by employees either by decreasing or increasing the hours recorded. [Dkt 20 at 19]. Plaintiffs allege that RenoSys utilized this capability to reduce the hours entered by employees, thereby paying them for fewer hours than they actually worked. [Dkt. 20 at 20]. According to Plaintiffs, they consistently complained to RenoSys about these adjustments and the subsequent decreased paychecks it caused. [Dkt. 20 at 21]. In response, Plaintiffs contend that RenoSys would occasionally correct the adjusted hours, though other times they left the inaccuracies in place. [Dkt. 20 at 21].

In addition to these hourly wage adjustments, Plaintiffs claim that RenoSys would maintain a similar practice of underpaying employees for prevailing wage jobs by manipulating the hours reported by its employees and making deductions "without a valid wage assignment or other authorization." [Dkt. 20 at 27].

Finally, Plaintiffs argue that, in early 2018, RenoSys offered Mr. Garrett a bonus payment plan, including a $5000 bonus and profit-sharing privileges. [Dkt. 20 at 34]. They further allege that, even though Garrett performed all the necessary preconditions entitling him to receive these incentives, RenoSys failed to pay Mr. Garrett either amount under the payment plan. [Dkt. 20 at 37].

## B. The Circumstances Leading to the Conclusion of Plaintiffs' Employment at RenoSys

On May 9, 2018, RenoSys claims that Mr. Garrett became engaged in a dispute with the company's CEO, Jason Mart, involving Mr. Garrett's demand for additional pay. [Dkt. 54-1 at 3]. When Mr. Garrett telephoned RenoSys's president, Steve Comstock, RenoSys asserts that Mr. Garrett was extremely hostile, exclaiming at one point that he was "going to fuck that motherfucker up," referring to Mr. Mart. *Id.*

Mr. Garrett allegedly repeated that threat, directing it to Mr. Comstock, during the course of another phone call occurring on May 15, 2018. [Dkt. 54-1 at 3, Comstock Dep.[2] 25:4-17]. This communication, according to RenoSys, prompted Mr. Comstock's decision to fire Mr. Garrett. [Dkt. 56-1, Comstock Dep. 25:21-23]. Despite stating in the course of this litigation that Mr. Garrett's threat motivated him to fire Mr. Garrett, Mr. Comstock, in a prior sworn statement executed in conjunction with a temporary restraining order against Mr. Garrett, asserted that "Mr. Garrett resigned from the company on May 15, 2018." [Dkt 54-1 at 13:25-14:1, p. 3]. Mr. Comstock attempts to explain in this litigation this firing/resigning discrepancy by maintaining that he used the word "resign" in order not to prejudice

---

[2] A 30(b)(6) deposition of RenoSys was taken on November 11, 2019. "Comstock Dep." refers to the portions of the 30(b)(6)) deposition completed by Mr. Comstock. "State Dep" refers to the portions of the 30(b)(6)) deposition completed by Ms. State.

Mr. Garrett's future job prospects. [Dkt. 56-1, Comstock Dep 28:8-18]. Other than this testimony, RenoSys has proffered no evidence to establish that either Plaintiff was terminated. Both Plaintiffs swear that they were never informed of their termination, rather that they ultimately left their positions voluntarily on their own accord. [Dkt. 58-1, Garrett Decl. ¶¶ 5, 7-9; Dkt. 58-2, Maxey Decl. ¶¶ 6, 7-9]

On the evening following the phone conversations between Mr. Garrett and himself, Mr. Comstock informed another employee, Mr. John McAllister, of Mr. Garrett's termination and of the resultant need to retrieve Mr. Garrett's company truck. [Dkt. 56-1, Comstock Dep. 26:16-17; 28:19-24]. When Mr. McAllister later informed Mr. Garrett of his plan to retrieve the truck, RenoSys claims that Mr. Garrett responded, "They better not come past the tree line because that's as far as my bullets reach." [Dkt. 56-1, Comstock Dep. 26:21-22; 28:25-19:3].

The next morning, May 16, 2018, Mr. Comstock allegedly discussed with four RenoSys employees Mr. Garrett's firing due to his threatening communications as well as the need for the company to retrieve the company truck from him. [Dkt. 56-1, Comstock Dep. 26:2-27:2]. Two of those employees attempted to retrieve the truck later that morning, but their efforts were thwarted due to the truck's location, being surrounded by vehicles on one side and a garage door on the other. [Dkt. 56-1, Comstock Dep. 27:3-8].

5

Later that same afternoon, on May 16, 2018, Mr. Garrett and Mr. Maxey along with Ms. Ashley Oaks (another co-worker and Mr. Garrett's romantic partner) arrived at RenoSys to request copies of their paystubs. [Dkt. 58-1, Garrett Decl. ¶ 3]. Eventually both Mr. Garrett and Mr. Maxey proceeded to the office of Paris State, RenoSys's payroll and human resources employee, to inquire about their paystubs, unpaid wages, and Mr. Garrett's unpaid bonus payments and profit-sharing. [Dkt 54-1, at 3]; [Dkt. 58-1, Garrett Decl. ¶ 4].

The conversation in Paris State's office got heated; Plaintiffs raised their voices and, as RenoSys maintains, blocked Ms. State from leaving the office.[3] [Dkt 43-2 at ¶ 5]. RenoSys also asserts that Mr. Maxey said he felt that his money had been "fucked with." [Dkt. 56-1, State Dep. 11:15-19]. Mr. Comstock and Mr. Wasson overheard the ruckus and entered Ms. State's office. [Dkt. 56-1, Comstock Dep. 15:15-21]. According to RenoSys, Mr. Garrett began cursing Mr. Comstock, to which Mr. Comstock responded, "you're done," "you're out of here," "hit the road," or some equivalent expression. [Dkt. 56-1, Comstock Dep. 9:1-9, 16:18-19, 30:14-18]. Mr. Comstock asserts that this is the moment when Mr. Garrett and Mr. Maxey were terminated from RenoSys. [Dkt. 56-1, Comstock Dep. 9:1-9, 16:18-

---

[3] Defendant asserts that Mr. Garrett made threats such as "you motherfuckers are going to pay," "I'm going to blow this place up," and indicated that he was "going to get the big guns and bring the whole building down." [Dkt. 56-1, Comstock Dep. 27:20-25]. Mr. Garrett swears that he did not make any of these statements but does admit saying that "'the way you play with peoples' money it's a wonder that somebody hasn't got the big guns to bring this place down." [Dkt. 58-1, Garrett Decl. ¶ 5].

19, 30:14-18]. In response, Plaintiffs unequivocally maintain that at no point during the meet did any RenoSys representative inform either Plaintiff that he was fired or that he no longer worked for RenoSys. [Dkt. 58-1, Garrett Decl. ¶¶ 5, 8]; [Dkt. 58-2, Maxey Decl ¶¶ 6, 8]. Plaintiffs were provided the requested paystubs and escorted from the building. [Dkt 43-2 at ¶ 6]. Neither Mr. Garrett nor Mr. Maxey ever returned to RenoSys after May 16, 2018 because, as they stated, they refused to work for RenoSys due to the salary payment disputes. [Dkt. 58-1, Garrett Decl. ¶ 7]; [Dkt. 58-2, Maxey Decl ¶ 7].

The following day, May 17, 2018, Ms. State sent letters to both Mr. Garrett and Mr. Maxey explaining that RenoSys had "accepted [their] resignation[s] starting immediately." [Dkt. 43-3-4]. RenoSys claims that Ms. State did not discuss these letters with any officer of RenoSys, did not sign the letters, or include her name anywhere on the letters. [Dkt. 56-1, State Dep. 5:9-6:2]. Plaintiffs claim that these letters represent the first time RenoSys ever informed them of a change in their employment status. [Dkt. 58, at 3].

Sometime after the May 16, 2018, incident, Mr. McAllister proposed that Mr. Maxey be rehired as a crew leader, suggesting that Mr. Maxey may have just gotten caught up in the "fracas". [Dkt. 56-1, Comstock Dep. 5:9-6:2]. Mr. Comstock agreed to extend an offer to Mr. Maxey to return to work, but Mr. Maxey refused. [Dkt. 58-1, Maxey Decl ¶ 9]. RenoSys asserts that, as to the timing

of their offer to Mr. Maxey to return to this position, it occurred several weeks after the May 16, 2018 incident. Plaintiffs on the other hand claim that Mr. Maxey was offered (and refused) the position within only a few days after the incident. *Compare*, [Dkt. 56-1, Comstock Dep. 22:13-25; 23:16-21] *with* [Dkt. 58-1, Maxey Decl ¶ 9].

Thereafter, Mr. Garrett filed a Charge of Discrimination, in which he stated, among other things, that though he had received the resignation letter from RenoSys, in fact, he had not resigned. [Dkt. 43-4 at 1].

## Analysis

### I. Standard of Review

Summary Judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to Judgment as a matter of law. Fed. R. Civ. P. 65(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). RenoSys's Summary Judgment burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [Plaintiff's] case." *Celotex*, 477 U.S. at 325. At Summary Judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary Judgment is not appropriate if a

reasonable jury could just as easily return a verdict for the non-moving party. *Paz v. Wauconda Healthcare & Rehab*. Ctr., LLC, 464 F.3d 659, 664 (7th Cir. 2006).

## II. Discussion

Ind. Code § 22-2-5-2, Indiana's Wage Payment Statute, provides an avenue for relief to employees seeking unpaid wages who voluntarily leave their employment or who remain employed and whose wages are overdue. *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 646 F.3d 487, 490 (7th Cir. 2011); *Walczak v. Labor Works-Ft. Wayne LLC*, 983 N.E.2d 1146, 1154 (Ind. 2013). In contrast, Indiana's Wage Claims Statute, IND. CODE § 22–2–9–2, applies to employees seeking unpaid wages after their employer has fired them. *Treat*, 646 F.3d at 490; *Walczak*, 983 N.E.2d at 1154 (agreeing that the Wage Claims Statute applies when an employee is fired). Thus, the critical inquiry in determining which of these two statutes governs is whether the employee left voluntarily or was terminated. It is this critical fact—and the surrounding facts and record evidence—that the parties strongly dispute. Their dispute ultimately precludes Summary Judgment.

### A. The Standard for Voluntary Leaving under the Payment Statute

As a preliminary matter, the parties dispute the meaning of "voluntarily leav[ing]" employment as contemplated by the Payment Statute. RenoSys maintains that voluntarily leaving is synonymous with resigning, and thus requires an intentional "act of relinquishment" by the Plaintiff(s), an act, according to

RenoSys, that neither Plaintiff took, thereby disqualifying them from a recovery under the Payment Statute. [Dkt. 55 at 2]. Plaintiffs maintain that the Indiana Payment Statute simply requires that an employee leave employment voluntarily–that is, that no overt act of relinquishment is required. [Dkt. 58 at 7]. Taking the argument a step further, Plaintiffs argue that "refusing to return to work for a company is the *per se* definition of a voluntary departure." [Dkt. 58 at 4].

We are not persuaded by RenoSys's imputed requirement that there be an "act of relinquishment" under the payment statute. RenoSys's theory apparently relies on case law setting out the definition of "resignation," *First Nat'l Bank v. Reynolds*, 491 N.E.2d 218, 222 (Ind. Ct. App. 1986), even though nowhere in the Payment Statute is the term "resignation" found. *See* IND. CODE 22-2-5-1. *Reynolds*, the case on which RenoSys relies, apply the Payment Statute in discussing "resignation." 491 N.E.2d at 222. There, the Indiana Court of Appeals addressed the applicability of section 24 of the National Bank Act (12 U.S.C. § 24) following the resignation of a bank president for a reason specified in his written employment contract. 491 N.E.2d at 221-223.

The plain reading of the Payment Statute, as noted by Plaintiffs, requires simply that employees "voluntarily leave[] employment," not that they specifically resign from their posts. IND. CODE 22-2-5-1. Additionally, RenoSys omits mention of any legal basis on which the Court should impute the resignation principles from

*Reynolds* into the wholly distinct Wage Payment statute. We will not conflate these two terms when the plain reading of the statute counsels against it, particularly when RenoSys has cited no case law to that effect.

That said, we are not necessarily convinced by Plaintiffs' argument either–that simply refusing to return to work for a company is the *per se* definition of a voluntary departure under the Payment Statute. The case law relied upon by Plaintiffs is clearly inapposite. In *Tutman*, Plaintiffs' proffered authority, the Court held that not returning to work because of "a single oblique threat" by a co-worker did not constitute a constructive discharge of Plaintiff under Title VII. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Again, these two legal contexts—Title VII's constructive discharges and the Wage Payment statute—are not interchangeable. Even if they were, the unavailability of a constructive discharge theory of liability does not transform Plaintiffs' actions into voluntary departures under the Payment Statute.

The phrase "voluntarily leave" from employment is undefined in the Payment Statute. Though the Indiana Supreme Court has made clear that the Payment Statute applies both to those who "keep or quit their jobs," the Court has not explained what quitting entails or otherwise means in the context of the statute. *Walczak*, 983 N.E.2d at 1154 (citing *J Squared, Inc. v. Herndon*, 822 N.E.2d 633, 640 n. 4 (Ind. Ct. App. 2005)). Nonetheless, we are not entirely without direction

11

in this regard. We have two bits of guidance here: First, the Indiana Supreme Court has ruled that the question of whether an employee has been fired or voluntarily leaves is "a mixed question of fact and law." *Walczak* 983 N.E.2d at 1153. Second, in *St. Vincent Hospital and Health Care Center, Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind. 2002), the Indiana Supreme Court, in determining whether the Claims Statute or Payment Statute applied in a particular setting, resolved the issue on the basis of how the separation was initiated. If the "employee [was] separated from work by their employer," the Claims Statute applies. *Id.* If the separation was caused by the employee herself (or she remained a current employee) the Payment Statute applies. *See*, *Id.* Consistent with the *Steele* distinction, the factual determination must be made regarding Plaintiffs' separation from RenoSys was initiated by RenoSys or by Plaintiffs themselves. To prevail on summary judgment, Defendants must be able to show, based on the undisputed evidence, that Plaintiffs did not voluntarily separate themselves from their employment with RenoSys. So far, that showing has not been achieved.

    **B. There are Genuine Disputes of Material Fact Remaining Regarding Whether Mr. Maxey was Fired or Voluntarily Left**

Mr. Maxey contends that he left RenoSys voluntarily, "refus[ing] to work for them" because of their wage dispute. [Dkt 58-2, Maxey Decl. ¶ 7]. In his sworn declaration, Mr. Maxey stated that at no time during the May 16, 2018 encounter between himself and the employees at RenoSys, or at any other time, did RenoSys

inform him that he was no longer employed by RenoSys. [Dkt 58-2, Maxey Decl. ¶¶ 6, 8]. To strengthen this assertion, he references correspondence from Ms. State, RenoSys' human resources employee, that RenoSys "accept[ed his] resignation." [Dkt. 43-4]. Mr. Maxey and Mr. Comstock have also testified that RenoSys later offered the crew leader position to Mr. Maxey, which was Mr. Garrett's former job, but Mr. Maxey refused it. [Dkt 58-2, Maxey Decl. ¶ 9] [Dkt. 56-1, Comstock Dep. 22:13-25; 23:16-21].

RenoSys contends, albeit obliquely, that it did in fact fire Mr. Maxey. However, RenoSys's Memorandum in Support of Summary Judgment actually omits this specific argument and evidence, instead devoting a large portion of its briefing to demonstrating that Mr. Maxey did not resign, despite Mr. Comstock's statements and Ms. State's correspondence referencing his resignation. *See, e.g.* [Dkt. 42 at 1 (explaining that "Maxey do[es] not have standing to pursue claims under the [Payment Statute] because [he] did not resign.")]; [Dkt. 42 at 2 (disputing the weight and meaning of the resignation letters sent by Ms. State)]. These arguments ignore the critical issue under the Payment Statute, however; it is not whether Mr. Maxey resigned, but whether he voluntarily left employment by separating himself from RenoSys.

Not until its Reply brief does RenoSys finally provide some evidentiary support for its claim that it fired Mr. Maxey, to wit, deposition testimony from Mr.

Comstock which appears to rebut Mr. Maxey's sworn declaration. [Dkt. 55]. This evidence such as it is falls far short of entitling RenoSys's to summary judgment. Our review of the evidence discloses more factual disputes and gaps than agreements. There is, for example, no evidence that Mr. Comstock or anyone else at RenoSys ever actually planned to fire Mr. Maxey, as opposed to Mr. Garrett. In fact, we are largely in the dark regarding Mr. Maxey's termination. There is also no evidence that anyone acting on behalf of RenoSys communicated to Mr. Maxey that he was fired following the May 16, 2018 incident. Mr. Maxey, of course, swears that he left Renosys voluntarily. [Dkt 58-2, Maxey Decl. ¶ 7]. RenoSys speculates that Mr. Maxey simply got caught up in the May 16, 2018 firing, after he complained that "he felt that his money had been 'fucked with,'" [Dkt. 56-1, State Dep. 11:15-19]. As previously noted, this outburst apparently led Mr. Comstock to fire Mr. Maxey on May 16, 2018. [Dkt. 56-1, Comstock Dep. 9:1-9, 16:18-19, 30:14-18]. Mr. Maxey has sworn to the contrary, claiming that Mr. Comstock did not fire him [Dkt 58-2, Maxey Decl. ¶¶ 6, 8]. Whether Mr. Maxey was fired or voluntarily left is a factual issue that will require a fact-finder to decide, based in part on the credibility of all these witnesses. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Because these and other important factual issues remain unresolved with regard to Mr. Maxey's post-resignation/termination invitation to work for RenoSys, summary judgment is unavailable.

C. **Genuine Disputes of Material Fact Remain Regarding Mr. Garrett's Departure from RenoSys**

The facts of Mr. Garrett's case are also unsettled, requiring a reasonable jury to decide whether to credit or discredit his factual assertion that he voluntarily left his employment or RenoSys's assertion that he was fired.

Mr. Garrett and Mr. Maxey agree in claiming that neither of them was informed by RenoSys during the May 16, 2018 incident that they were fired. [Dkt 58-1, Garrett Decl. ¶¶ 5, 8]. Mr. Garrett asserts that he and he alone made the decision not to return to work because of the wage dispute. [Dkt 58-1, Garrett Decl. ¶ 7]. Citing the letter he received from RenoSys post departure "accepting [his] resignation" Mr. Garrett maintains that it corroborates his claim. [Dkt. 43-3]. In fact, citing Mr. Comstock's sworn statement that "Mr. Garrett resigned from the company on May 15, 2018," he says provides further proof. [Dkt 54-1 at 13:25-14:1, p.3].

RenoSys's evidence proffered to rebut Plaintiff's factual assertions need not be further delineated because the upshot is simply that these factual disputes foreclose summary judgment.

15

Whether RenoSys's evidence is ultimately convincing by a preponderance of the evidence, we do not venture a guess. What we know for sure is that material issues genuinely in dispute remain. We must not and will not weigh the parties' competing theories of proof.

## **Conclusion**

For the reasons detailed above, Defendant's Motion for Summary Judgment [Dkt. 41] is <u>DENIED</u>.

IT IS SO ORDERED.

Date: 3/17/2020

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

David J. Bodle
HACKMAN HULETT LLP
dbodle@hhlaw-in.com

Steven T. Henke
HACKMAN HULETT LLP
shenke@hhlaw-in.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
amcneil@boselaw.com

Tyler John Moorhead
BOSE MCKINNEY & EVANS LLP
tmoorhead@boselaw.com

Anthony Seaton Ridolfo, Jr.
HACKMAN HULETT LLP
aridolfo@hhlaw-in.com